UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:14-CV-730

| | |
|---|---|
| GLENDA S. SIMMONS and CALVIN C. SIMMONS as Co-Guardians and Co-Conservators of their son, BRYAN O'NEIL SIMMONS, and TIFFANY SIMMONS. <br><br> *Plaintiffs,* <br><br> vs. <br><br> CORIZON HEALTH, INC., CORIZON,LLC, B.J. BARNES, in his official capacity as Sheriff of Guilford County, North Carolina, GUILFORD COUNTY SHERIFF'S DEPARTMENT, GUILFORD COUNTY, a governmental entity of the State of North Carolina, and THE LOCAL GOVERNMENT EXCESS LIABILITY FUND, INC., <br><br> *Defendants.* | **COMPLAINT** <br> **(Jury Trial Demanded)** |

NOW COME the Plaintiffs by and through undersigned counsel of record and allege as follows:

## PRELIMINARY STATEMENT OF FACTS

1)      This case is brought pursuant to 42 U.S.C. § 1983.  Simmons was at all relevant times a 36 year old United States citizen residing in Guilford County, North Carolina.

2)      Bryan Simmons was incarcerated in the Guilford County Jail for a parole violation beginning on September 4th, 2012 for a period of 90 days, with his release to be on December 3, 2012.

3)      Simmons entered the jail with no significant health issues.

4)    In mid to late November, 2012, Simmons began complaining of constipation, severe stomach pain, a distended stomach and vomiting of blood.

5)    Blood work was drawn from Simmons on November 22nd, 2012, but not reviewed until after he suffered a cardiac arrest from internal bleeding on December 2nd, 2012.

6)    On December 1, 2012, Simmons' parents received a call from a cellmate that told them that Simmons had collapsed on the floor, unable to move and had urinated on himself.  He had asked the cellmate to call his parents and ask the jail for help.

7)    Glenda and Calvin Simmons immediately drove to the jail but their request to see their son was denied.  They were reassured that Simmons was okay.  The parents pleaded for their son to be taken to the hospital, and they explained that he must be seriously ill because he was going to be released in two (2) days and that he would not be requesting to go to the hospital unless he believed emergency services were needed.

8)    On or about December 1, 2012, Simmons was moved from a general cell to a medical cell where he was placed on video surveillance because it was believed he was "suicidal."

9)    Videotape of the events described herein, including Bryan Simmons pleading for help in his jail cell, conversations with detention officers and nurses, Simmons collapsing in the jail elevator and jail corridor and his transfer to and from a medical examining room during his cardiac arrest have been produced by Guilford County.

10)   While in the cell and as recorded on video, Simmons vomited blood repeatedly and begged the Guilford County detention officers and the nursing staff of Corizon (who provided health services to the jail) to allow him to go to the hospital.

11)   Simmons repeatedly told the jail staff and nurses that "he was bleeding on the inside"

and he could feel the blood "churning" in his stomach. He is seen on the video pleading for help and drawing the word "HELP" and "9-1-1" in the air with his finger.

12) On the video, one Corizon nurse identifies Simmons' blood on the floor as from the "gastric" and says "ulcer probably."

13) At all relevant times, Corizon Health, Inc. had contracted with Guilford County to provide medical treatment to the jail inmates.

14) As part of its contractual obligation, it was required to abide by both written national standards for jails and prisons and a written directive and policy provided by the Director of Health Services for Guilford County. Those services included, *inter alia*, providing 24 hour emergency care, reviewing laboratory reports with the inmate, and examination by a jail physician.

15) Corizon nurses told Simmons that only a doctor could send him to the hospital and that he could not be seen by the doctor because he would be released before the doctor made another visit to the jail.

16) If Simmons had been sent to the hospital from the jail, Corizon was contractually responsible for paying those medical expenses.

17) Despite Simmons' medical condition and the fact the Corizon nursing staff identified that the vomited blood was from a perforated ulcer, Corizon failed to provide emergency care to Simmons, who collapsed from cardiac arrest hours before his release.

18) The cardiac arrest was induced by his internal bleeding from an ulcer.

19) Simmons is in a permanent and persistent vegetative state as a result of the Defendants' failure to provide medical care to Simmons.

20) Defendants intentionally refused to provide and in fact did deny Simmons minimally adequate medical care and treatment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

21) Defendants' acts are shocking to the conscience, are a severe deprivation of civil rights, and are intolerable in a society governed by civil laws and considerations of due process.

22) Tiffany Simmons was and is the wife of Bryan Simmons and as a result of the injuries suffered by Bryan she maintains a loss of consortium claim.

## JURISDICTION AND VENUE

23) This Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331 and § 1343(a)(3). The substantive claims herein arise under 42 U.S.C. § 1983, violations of civil rights, and the Eight and Fourteenth Amendments to the United States Constitution. The pendent state claims are before the Court pursuant to 28 U.S. Code § 1367.

## THE PARTIES

24) Glenda S. Simmons and Calvin C. Simmons are husband and wife, are citizens and residents of Guilford County, North Carolina and the parents of Bryan Simmons.

25) Bryan O'Neil Simmons is an incompetent adult residing in an assisted living facility in Fincastle, Virginia, but is formerly a resident of Guilford County, North Carolina. He is the only son of Glenda and Calvin Simmons. He was approximately 36 years old when the events herein occurred.

26) Glenda and Calvin Simmons were appointed as co-guardians and co-conservators of their son by order of the Virginia Circuit Court of Botetourt County on October 2, 2013.

-4-

27)     Tiffany Simmons is a citizen and resident of Guilford County, and was and is the wife of Bryan Simmons, having married Simmons in March 2012, approximately six months prior to his 90 day incarceration that began in September 2012.

28)     The Defendant, Corizon Health, Inc., is a company incorporated in a state unknown to the Plaintiffs, but which is domiciled in Brentwood, Tennessee. On March 19, 2014, Corizon, LLC filed an application for Certificate of Authority for a Limited Liability Corporation with the North Carolina Secretary of State, and upon information and belief is a successor in interest to Corizon Health, Inc.  For the purposes of this Complaint, the entities may simply be referred to as "Corizon."

29)     The Defendant, Corizon is a health care company that provides health care services to jails and prisons across the United States, and specifically at all times relevant to this action was providing health care services to the Guilford County Jail pursuant to a written contract with Guilford County ("the Contract").

30)     At all times relevant hereto, Sheriff B.J. Barnes was responsible for the administration, operation and supervision of the Guilford County jail system, and for the promulgation and enforcement of the rules, regulations, policies, customs and practices relevant thereto and at all times pertinent hereto was acting in that capacity and under the color of state law.

31)     The Defendant, Guilford County Sheriff's Department is a governmental entity existing under the North Carolina Constitution and the North Carolina General Statutes, whose responsibilities include the maintenance, control, management and supervision of the Guilford County Jail.

32)     The Defendant, Guilford County, is a county within the State of North Carolina

created by the North Carolina Constitution and the General Statutes of North Carolina.

33) The Defendant, The Local Government Excess Liability Fund, Inc. is a corporation existing under the laws of the State of North Carolina that provides a surety bond for the Sheriff of Guilford County.

## CONDITIONS PRECEDENT

34) Plaintiffs have complied with all conditions precedent in this case and exhausted all applicable administrative remedies, or they have been waived.

## GENERAL FACTUAL ALLEGATIONS

35) The Plaintiff, Bryan Simmons, was given a 90 day active sentence for a parole violation. Said sentence was to begin on September 4, 2012 and end on December 3, 2012.

36) For approximately the last two months of his 90 day sentence, Simmons was incarcerated in the Guilford County Jail, located in Greensboro, North Carolina.

37) During his incarceration, Simmons was a model prisoner, complying with all requests and commands of the detention officers who were employed by the Guilford County Sheriff's Department and thus Guilford County.

38) At the time Simmons was admitted into the jail, he had no significant medical issues.

39) In late November 2012 Simmons began to complain of severe stomach pain, prolonged constipation, and he began vomiting blood.

40) Simmons made the jailers and the medical staff of Corizon aware of his medical complaints and his bloody vomit was readily apparent to the Defendants.

41) Corizon's contract with Guilford County required it to comply with the National Commission on Correctional Health Care (NCCHC) which provided the minimum

standards of healthcare to inmates.

42) Corizon was also contractually obligated to abide by a written directive from the Director of Health Services for Guilford County.

43) Corizon's contractual obligation was to provide 24 hour emergency care, 7 days a week. This contract with Corizon had been renewed approximately 10 days prior to the events described herein.

44) Section J-E-12 of the NCCHC required the healthcare provider to timely review the findings of lab work with the inmate and to modify treatment of the patient based upon the results of the lab work. Then the physician is responsible for implementing the change.

45) On November 22, 2012, Corizon nurses took the blood of Simmons and administered certain laxatives.

46) The results of the lab work were received by the jail on or before November 24th.

47) There were two very important test results from this lab work (BUN and Creatinine Serum). These tests measure the level of waste product in the bloodstream. A high reading in these two tests is recognized as being an indication of intestinal bleeding and renal failure. A normal BUN score is 5-20. Simmons registered a 38. A normal Creatinine level is .57 to 1.27 – Bryan's was 5.01.

48) The blood work of Simmons was not reviewed by Corizon's jail physician until December 4th, 2012, approximately two days after Simmons went into cardiac arrest and suffered a hypoxic brain injury on December 2, 2012.

49) On November 22, 2012, Thanksgiving Day, Simmons called his parents from a telephone at the jail. This telephone call was recorded by the Sheriff's Department. In

the telephone conversation, Simmons told his parents that he has been unable to "go to the bathroom" for several days and had been "throwing up blood."

50) His parents expressed concern that he might have "locked bowels", a potentially fatal condition.

51) On November 24th, 2012, Simmons was found on the floor of his cell, apparently unconscious. There were signs of blood on his clothing and floor.

52) He was not examined by a physician and his request to be seen at a hospital was denied by the Corizon staff.

53) Without a cessation of his symptoms, on November 30th, 2012 Simmons' medical records indicate that he complained of sharp abdominal pain and shortness of breath. He was apparently given some type of pain medication, but was not examined by a physician.

54) On Saturday, December 1, 2012, another inmate, Charles "CV" Smith called Bryan's parents, Glenda and Calvin Simmons, on behalf of Bryan. The telephone call was recorded by the Sheriff's Department. In the call, CV explained that Bryan was too sick to come to the phone; that Bryan had collapsed on the floor and had urinated on himself during the night. Simmons had asked CV to beg his parents to come to the jail.

55) Simmons' parents immediately went to the jail. Glenda and Calvin arrived at the jail at approximately 1:30 PM, soon after CV's call. Their request to see their only son was denied. They spoke with a detention officer, who said that they could not see Bryan, but the officer had "EMT training" and that he would check on Bryan.

56) The officer returned in a few moments and said that he had walked Bryan around, he

had checked Bryan's pupils and that he had checked Bryan's head for injuries from his fall. He reassured the parents that Bryan was okay and that he had ordered new clothes and linen for him.

57) Glenda Simmons begged the jailer to take Bryan to the hospital and if nothing was wrong they could bring him back. She explained that Bryan was going to be released in less than two days and that there was no other explanation for him wanting to go to the hospital, other than his serious medical condition.

58) Simmons was to be released at 9 AM on Monday, December 3rd, 2012.

59) Around 4:55 PM on December 1, the jailers and nurse reported that Bryan had a bloody rag in this mouth and wanted to kill himself due to the pain he was experiencing. He was transferred to a "suicide watch" cell which had a window in the door and a glass sidelight.

60) At 10:35 that night, Corizon nurses Story and Dios observed Simmons with bloody vomit on his face, but Nurse Story said that hospitalization is not required.

61) A video camera was set up outside of his door to videotape Simmons. There was also a video camera located in the back of the cell pointed towards the cell door.

62) Most of the next several hours in the cell were recorded, but there is a significant amount of time in which there is no recording.

63) Simmons was placed in the cell in a wheelchair because he was unable to stand or walk without assistance.

64) Under its contract with the County, if an inmate is transferred to a hospital from the jail for medical treatment, the cost of the hospital care is Corizon's expense.

65) At 12:12 AM on December 2nd, a female detention officer checked on Bryan. He

explained that he was in great pain ("on a scale to 1-10 – I'm a 20") and that he had been throwing up blood for days. He said the pain was in his stomach and groin. At this point, the video shows that his stomach is greatly distended. He told the officer that "there is a blockage in my stomach or something." He also told the staff that he is "bleeding on the inside" and that he "can feel it churning" in his stomach.

66) Approximately 10 minutes later on the video one can see and hear Simmons say "Help, Help" and he proceeded to spell out the word "Help" in the air with his finger in front of the window and video camera followed by drawing "9-1-1".

67) A short time later, another guard (male), was asked by Simmons for a cup of water. The jailer replied that he will tell the nurse about his request. When the guard returned, Simmons asked the same officer for a drink of water, but Simmons is told that he can get some water out of the sink that was behind a short concrete wall located behind him.

68) Simmons was in a wheelchair and said he could not walk. The guard indicated that he believed he could walk. Over the next several minutes, Simmons was seen trying to maneuver his chair to the sink. However, his wheelchair was too wide to fit between a steel bench and the corner of the concrete wall.

69) Eventually, Simmons was able to stand using the wall as a support and briefly got to the sink for a sip of water before returning to his wheelchair.

70) Throughout the hours of the night and early morning, Simmons was seen and was recorded vomiting blood many times and for long periods of time. Blood was observed coming from his mouth and falling on his chest, the floor and projecting onto the glass window on the door.

-10-

71) Simmons called a guard and said "I'm foaming at the mouth." The foaming is visible to the guard and recorded in the video.

72) A different male guard then checked on Simmons sometime later. Simmons complained that he was experiencing great pain in his stomach and the guard said he would call a nurse. Despite the fact that this is well after midnight, Simmons had not slept due to the discomfort.

73) Subsequently, in the video you can hear an intercom conversation in the cell. Simmons twice said "I've just thrown up blood again", to which the officer said, "OK", "Standby". A few minutes later a guard arrives, sees the blood and said, "I will get the nurse to take a look at you."

74) At 1:59 AM a male nurse (or physician's assistant) (believed to be "Dios" or "Diaz") checked on Simmons. He was recorded as saying, "We've put you on the doctor's list already - when he comes in, he will see you first." But Simmons explained that he is due to be released the next day before the doctor arrives. Bryan told the nurse, "I'm bleeding on the inside . . . I can feel it churning." The deputies proceeded to clean the cell of the vomited blood.

75) The slightest touching of Bryan's stomach resulted in pain. This hypersensitivity combined with his distended stomach and blood vomit, are direct symptoms of internal bleeding.

76) The nurse repeated that they had "told the doctor about it" but that the nurse cannot send him to the hospital, "only the doctor can."

77) Bryan constantly told the male nurse that he is "bleeding on the inside" and that he can "feel it churning." The nurse tells Simmons that the doctor will not see him until

-11-

9:00 AM the next day but Simmons constantly tries to explain that he is going to be released before then. The nurse responds by saying "the doctor comes on Mondays and that's the way it is to be."

78) Bryan then told the nurse, "I've been throwing up blood for days". The nurse asked, "How many days" and Bryan responded, "About four." To which the nurse can be heard to say, "Survive that thing now" or "Survive the day now" followed by "You'll be alright".

79) At one point Simmons complained to a detention officer through the intercom in his cell that he was constantly vomiting blood and was in great pain, and through the intercom the detention officer said, "You need to stop making yourself throw up".

80) While the jailers were cleaning the blood from the window and floor, Bryan refused to move his wheelchair from the doorway until he could get some medical help. He was forced back into the cell by Jailers pushing on his stomach which caused Bryan to scream in pain. Both the nurse and the guard can be heard saying, "You'll be alright."

81) The male Corizon nurse (presumable "Dios" or "Diaz") then pointed at the blood on the floor and explained to the others present (as recorded on the video) that "this is not fresh blood." He says that is "old blood" . . . "probably from the gastric." He then said ulcer probably."

82) Despite this suspected diagnosis, no other medical care is provided and no consultation with a physician occurred or was even suggested.

83) Later that day at approximately 1:00 PM, Simmons, who had not slept, was removed from the cell and escorted to an elevator in preparation for his release. A video camera in the elevator showed Simmons collapsing in the elevator.

-12-

84) A guard on the elevator eventually pulled Simmons to his feet by his handcuffs.

85) On the way to a cell on the medical ward, Bryan collapsed again from the elevator, and again was pulled to his feet by the jailer.

86) Simmons was finally placed in a cell.

87) Approximately eight minutes later, Simmons went into cardiac arrest caused by excessive internal bleeding from a perforated ulcer.

88) An emergency 911 call was made. The Fire Department arrived first, followed by Guilford County EMS (Emergency Medical Services).

89) According to the EMS notes, the responding medics asked for any complaints from Simmons before he collapsed. Recorded in their notes they were told, "According to staff, patient was reported to have vomited once last night however has not had and reported any complaint today." There is no mention of the previous days or the preceding night wherein Simmons had complained of pain, distention, his concern about internal bleeding or his constant vomiting of blood for at least four days despite the actual knowledge of the custodians, and more particularly, the nursing staff.

90) One requirement under the arrangement with the County's Health Director is that when there is a "code" that nurses must respond with a "code kit" and oxygen. The video showing Bryan being removed from his cell shows no medical equipment being removed from the cell and no oxygen being applied to Simmons.

91) Simmons was wheeled from his cell, unconscious, to a medical treatment room. In the video recording there is no administration of any medical treatment and there is no sense of urgency of the medical staff in taking him to the examination room.

92) Upon information and belief, the medical equipment needed for a code was locked in

-13-

a room and the staff could not immediately locate a key to access the equipment.

93) CPR was eventually begun at the jail, and Simmons was transported to Moses Cone hospital with a perforated and bleeding ulcer that had induced the cardiac arrest. Due to the lack of oxygen to his brain, Simmons suffered a catastrophic hypoxic brain injury.

94) Upon information and belief, 34 minutes elapsed from the time of Simmons' collapse and the administration of oxygen by medical personnel.

95) Due to the lack of oxygen after his collapse, Simmons is profoundly disabled and is in a permanent vegetative state. He is a complete quadriplegic. His hands and feet have become horrifically contorted over time. He is only able to breathe through a tracheotomy. He is unable to be fed except intravenously. At times he suffers bedsores that are so deep that exposed bone can be seen in the wound. He is unable to speak. He intermittently must be re-hospitalized due to bed sores and infections.

96) Under the terms of its contract with Guilford County, Corizon is paid 6.9 million dollars for 24 months of inmate care.

97) Corizon contractually agreed to provide 24 hour medical care, 7 days a week to all inmates.

98) Corizon agreed to meet or exceed NCCHC standards.

99) Corizon agreed to meet or exceed the written directives of the Guilford County Health Services Director.

100) Paragraph G of Exhibit A to Corizon's contract with Guilford County requires a physician to perform daily triage of complaints from inmates. There is no indication that Corizon's jail physician, Dr. Fitzhugh, ever examined Bryan from at least

-14-

November 22nd through his cardiac arrest on December 2nd.

101) Upon information and belief, Dr. Fitzhugh did not review the November 22nd blood work until December 4, 2012 - 2 days after Bryan was in a vegetative state.

102) Paragraph V of the Corizon contract is entitled "Medical Care." It requires Corizon to identify, coordinate and pay for all emergency care given to inmates. By delaying treatment to Simmons, Corizon could avoid the charges associated with hospitalization, knowing that Simmons' release from the jail was imminent.

103) The NCCHC requires that inmates have access to care. The term "access to care" is defined in the regulations as receiving medical care in a timely fashion. Corizon did not provide medical care to Simmons for his ulcer, despite having associated his symptoms with that of a bleeding ulcer several hours before his cardiac arrest.

104) Section J-D-05 of the NCCHC says that inmates are to have access to necessary hospitalization with waiting times not to generally exceed the average waiting times in community practice. Simmons was denied hospitalization for at least a week prior to his collapse.

105) The requirement to provide emergency services is mandated in Section J-E-08 which requires a jail to provide 24-hour *emergency* services. (original emphasis).

106) Emergency care is further defined as an acute illness which cannot be deferred until the next doctor's visit. The Corizon nurse told Bryan that only the doctor could send him to the hospital and that doctor was not coming until after Bryan was released, and said, "that's the way it is to be."

## COUNT I
### (42 U.S.C. 1983 Claim against Defendant Sheriff, B.J. Barnes
### in his Official Capacity, Guilford County Sheriff's Department and Guilford County)

-15-

107) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

108) Count I is brought against the Defendant Sheriff B.J. Barnes in his official capacity, the Guilford County Sheriff's Department and Guilford County pursuant to 42 U.S.C. 1983 for deliberate indifference to the critical medical needs of Simmons, as an individual with a bleeding ulcer and with symptoms of prolonged constipation, frequent and repeated vomiting of blood, distended stomach, severe pain, etc., that required testing and immediate emergency treatment to prevent substantial health deterioration including cardiac arrest, hypoxic brain injury and a persistent vegetative state.

109) At all times relevant hereto, Guilford County was vicariously liable for the acts of its Sheriff, the Sheriff's Department and Corizon.

110) The Guilford County Sheriff's Department and/or its employees or agents, knew at least by November 2012 that Simmons was critically ill and if left untreated he could suffer serious permanent medical disability or even death.

111) By at least Thanksgiving 2012, the Guilford County Sheriff's Department and its employees or agents knew that Simmons was suffering great medical distress, and had collapsed on several occasions and had lost his ability to walk or stand due to his medical condition.

112) Despite the Sheriff's knowledge of Simmons' serious medical condition and needs, Defendant Sheriff's Department was deliberately indifferent to those serious medical needs in failing to provide the necessary care and treatment of Simmons.

113) The Guilford County Sheriff's Department and/or its employees or agents knew or

-16-

should have known that taking no action and/or insufficient action could result in the rapid and permanent deterioration of Simmons' health and even his death.

114) The Sheriff's Department knew that approximately one year earlier, a 21 year old inmate had died in their custody due to lack of medical attention.

115) As a direct and proximate result of the Sheriff's Department institutional outright denial of medical treatment and/or deliberate indifference towards Simmons' serious medical needs, Simmons suffered great physical injury, pain, discomfort and mental anguish in violation of Simmons' Eighth and Fourteenth Amendment rights.

116) As a result, Simmons suffered damages in an amount to be determined at trial for his bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expenses for his care and treatment in an effort to alleviate and cure his injuries, and will continue to incur additional expenses in the future, loss of earnings, loss of ability to earn money. The losses are permanent and Simmons will suffer losses in the future. Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest and further relief as the Court deems appropriate.

## COUNT II
### (42 U.S.C. 1983 Claim against Defendant Corizon)

117) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

118) Count II is brought against the Defendant Corizon pursuant to 42 U.S.C. 1983 for deliberate indifference to the critical medical needs of Simmons, as an individual with a bleeding ulcer and with symptoms of constipation, frequent vomiting of blood, distended stomach, severe pain, etc., that required testing and immediate emergency

-17-

treatment to prevent substantial health deterioration including cardiac arrest, hypoxic brain injury and a persistent vegetative state.

119) Corizon and/or its employees or agents, knew at least by mid-November 2012 that Simmons was critically ill and if left untreated he could suffer serious permanent medical disability or even death.

120) By at least Thanksgiving 2012, Corizon and its employees or agents knew that Simmons was suffering great medical distress, and had collapsed on several occasions and had lost his ability to walk or stand due to his medical condition.

121) Despite the Corizon's of Simmons' serious medical condition and needs, Defendant Corizon was deliberately indifferent to those serious medical needs in failing to provide the necessary care and treatment of Simmons.

122) Corizon and/or its employees or agents knew or should have known that taking no action and/or insufficient action could result in the rapid and permanent deterioration of Simmons' health and even his death.

123) At all times relevant to this Complaint, it was Corizon's widespread custom, policy and/or practice and/or procedure to outright deny medical treatment of or be deliberately indifferent to the serious medical needs of Plaintiff and other prisoners/detainees incarcerated with the Guilford County Jail system who had serious and expensive medical problems.

124) As a direct and proximate result of Corizon's institutional outright denial of medical treatment and/or deliberate indifference towards Simmons' serious medical needs, Simmons suffered great physical injury, pain, discomfort and mental anguish in violation of Simmons' Eighth and Fourteenth Amendment rights.

125)     As a result, Simmons suffered damages in an amount to be determined at trial for his bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expenses for his care and treatment in an effort to alleviate and cure his injuries, and will continue to incur additional expenses in the future, loss of earnings, loss of ability to earn money. The losses are permanent and Simmons will suffer losses in the future. Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest and further relief as the Court deems appropriate.

## COUNT III
### (Negligence against Defendants)

126)     Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

127)     The Defendants owed a duty to the Plaintiff Simmons, to provide him with needed health care while he was incarcerated in the Guilford County jail. The Defendants negligently breached that duty in one or more of the following ways:

a.     Failed to provide emergency care;

b.     Failed to timely review blood work;

c.     Failed to contact its physician in charge and relay Simmons' symptoms;

d.     Failed to transport Simmons to a hospital;

e.     Misrepresented Simmons' medical conditions to EMS personnel;

f.     Failed to provide appropriate medical response to symptoms of a bleeding ulcer;

g.     Failed to provide appropriate medical response to Simmons' cardiac arrest;

h.     Misrepresented Simmons' condition to his parents.

-19-

128) As a direct and proximate result of the negligence of the Defendants, the Plaintiff, Simmons, suffered damages in an amount to be determined at trial for his bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expenses for his care and treatment in an effort to alleviate and cure his injuries, and will continue to incur additional expenses in the future, loss of earnings, loss of ability to earn money. The losses are permanent and Simmons will suffer losses in the future. Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest and further relief as the Court deems appropriate.

## COUNT IV
### (Tiffany Simmons' loss of consortium claim against Defendants)

129) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

130) Tiffany and Bryan Simmons were married in March 2012.

131) They had a loving relationship and supported each other emotionally, financially and in other ways that a husband and wife support each other.

132) In the marital relationship there is a mutual right of a husband and wife to the society, companionship, comfort and affection of one another.

133) Through the reckless indifference and/or negligent conduct of one or more of the Defendants as set forth herein, Bryan Simmons was rendered unable to provide society, companionship, comfort and affection to his wife in that he is in a permanent vegetative state.

134) As a result of the medical, physical and intellectual condition of her husband, Tiffany Simmons has lost the society, companionship, comfort and affection of her husband. Because of this loss of consortium, Tiffany Simmons is entitled to recover money

damages in an amount to be determined by a jury.

## COUNT V
### (Punitive damages against Defendants Corizon)

135) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

136) The callous acts of Corizon as described herein constitute malice or willful or wanton conduct.

137) The officers, directors, or managers of Corizon participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages in that similar acts of reckless indifference have incurred not only in other prisons and jails across the country, but actually in the Guilford County jail.

138) As a result of the acts described herein, Bryan Simmons is entitled to a recovery of punitive damages to be determined by a jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs pray for judgment against the Defendants as follows:

1) That the Plaintiffs have and recover compensatory damages from the Defendants in an amount to be determined at trial.

2) That the Plaintiffs be awarded punitive and/or exemplary damages for malicious, wanton, willful, reckless acts of the Defendant, Corizon, which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct.

3) That the Defendants be taxed with the costs of this action, including reasonable attorney fees as allowed by law, expenses, prejudgment interest, etc.

-21-

4)      That all issues so triable, be tried to a jury.

5)      For any other relief this Court deems just and proper under the circumstances.

This the 26th day of August, 2014.

/s/ Fred W. DeVore, III
Fred W. DeVore, III – NC State Bar #10308
F. William DeVore, IV – NC State Bar #39633
Derek P. Adler – NC State Bar #39488
*Attorney for Plaintiffs*
DeVORE, ACTON & STAFFORD, PA
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 *facsimile*
*fdevore@devact.com*