UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
Civil Action No. 1:14-CV-730

GLENDA S. SIMMONS and
CALVIN C. SIMMONS as Co-Guardians
and Co-Conservators of their son,
BRYAN O'NEIL SIMMONS, and
TIFFANY SIMMONS;

*Plaintiffs,*

vs.

CORIZON HEALTH, INC.,
CORIZON,LLC, B.J. BARNES, in his
official capacity as Sheriff of Guilford
County, North Carolina, GUILFORD
COUNTY, a governmental entity of the
State of North Carolina, and THE
LOCAL GOVERNMENT EXCESS
LIABILITY FUND, INC.,

*Defendants.*

**FIRST AMENDED COMPLAINT**
**(Jury Trial Demanded)**

 **NOW COME THE PLAINTIFFS** amending their Complaint as a matter of

right pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT OF FACTS

1) This case is brought pursuant to 42 U.S.C. § 1983.  Simmons was at all relevant

 times a 36 year old United States citizen residing in Guilford County, North

 Carolina.

-1-

2)     Bryan Simmons was incarcerated in the Guilford County Jail for a parole violation beginning on September 4th, 2012 for a period of 90 days, with his release to be on December 3, 2012.

3)     Simmons entered the jail with no significant health issues.

4)     In mid to late November, 2012, Simmons began complaining of constipation, severe stomach pain, a distended stomach and vomiting of blood.

5)     Blood work was drawn from Simmons on November 22nd, 2012, but not reviewed until after he suffered a cardiac arrest from internal bleeding on December 2nd, 2012.

6)     On December 1, 2012, Simmons' parents received a call from a cellmate that told them that Simmons had collapsed on the floor, unable to move and had urinated on himself. He had asked the cellmate to call his parents and ask the jail for help.

7)     Glenda and Calvin Simmons immediately drove to the jail but their request to see their son was denied. They were reassured that Simmons was okay. The parents pleaded for their son to be taken to the hospital, and they explained that he must be seriously ill because he was going to be released in two (2) days and that he would not be requesting to go to the hospital unless he believed emergency services were needed.

8)     On or about December 1, 2012, Simmons was moved from a general cell to a

-2-

medical cell where he was placed on video surveillance because it was believed he was "suicidal."

9) Videotape of the events described herein, including Bryan Simmons pleading for help in his jail cell, conversations with detention officers and nurses, Simmons collapsing in the jail elevator and jail corridor and his transfer to and from a medical examining room during his cardiac arrest have been produced by Guilford County.

10) While in the cell and as recorded on video, Simmons vomited blood repeatedly and begged the Guilford County detention officers and the nursing staff of Corizon (who provided health services to the jail) to allow him to go to the hospital.

11) Simmons repeatedly told the jail staff and nurses that "he was bleeding on the inside" and he could feel the blood "churning" in his stomach. He is seen on the video pleading for help and drawing the word "HELP" and "9-1-1" in the air with his finger.

12) On the video, one Corizon nurse identifies Simmons' blood on the floor as from the "gastric" and says "ulcer probably."

13) At all relevant times, Corizon Health, Inc. had contracted with Guilford County to provide medical treatment to the jail inmates.

14) As part of its contractual obligation, it was required to abide by both written

-3-

national standards for jails and prisons and a written directive and policy provided by the Director of Health Services for Guilford County. Those services included, *inter alia*, providing 24 hour emergency care, reviewing laboratory reports with the inmate, and examination by a jail physician.

15) Corizon nurses told Simmons that only a doctor could send him to the hospital and that he could not be seen by the doctor because he would be released before the doctor made another visit to the jail.

16) If Simmons had been sent to the hospital from the jail, Corizon was contractually responsible for paying those medical expenses.

17) Despite Simmons' medical condition and the fact the Corizon nursing staff identified that the vomited blood was from a perforated ulcer, Corizon failed to provide emergency care to Simmons, who collapsed from cardiac arrest hours before his release.

18) The cardiac arrest was induced by his internal bleeding from an ulcer.

19) Simmons is in a permanent and persistent vegetative state as a result of the Defendants' failure to provide medical care to Simmons.

20) Defendants intentionally refused to provide and in fact did deny Simmons minimally adequate medical care and treatment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

21) Defendants' acts are shocking to the conscience, are a severe deprivation of

-4-

civil rights, and are intolerable in a society governed by civil laws and considerations of due process.

22) Tiffany Simmons was and is the wife of Bryan Simmons and as a result of the injuries suffered by Bryan she maintains a loss of consortium claim.

## JURISDICTION AND VENUE

23) This Court's jurisdiction is invoked pursuant to 28 U.S.C. §1331 and § 1343(a)(3). The substantive claims herein arise under 42 U.S.C. § 1983, violations of civil rights, and the Eight and Fourteenth Amendments to the United States Constitution. The pendent state claims are before the Court pursuant to 28 U.S. Code § 1367.

## THE PARTIES

24) Glenda S. Simmons and Calvin C. Simmons are husband and wife, are citizens and residents of Guilford County, North Carolina and the parents of Bryan Simmons.

25) Bryan O'Neil Simmons is an incompetent adult residing in an assisted living facility in Fincastle, Virginia, but is formerly a resident of Guilford County, North Carolina. He is the only son of Glenda and Calvin Simmons. He was approximately 36 years old when the events herein occurred.

26) Glenda and Calvin Simmons were appointed as co-guardians and co-conservators of their son by order of the Virginia Circuit Court of Botetourt

-5-

County on October 2, 2013.

27) Tiffany Simmons is a citizen and resident of Guilford County, and was and is the wife of Bryan Simmons, having married Simmons in March 2012, approximately six months prior to his 90 day incarceration that began in September 2012.

28) The Defendant, Corizon Health, Inc., is a company incorporated in a state unknown to the Plaintiffs, but which is domiciled in Brentwood, Tennessee. On March 19, 2014, Corizon, LLC filed an application for Certificate of Authority for a Limited Liability Corporation with the North Carolina Secretary of State, and upon information and belief is a successor in interest to Corizon Health, Inc. For the purposes of this Complaint, the entities may simply be referred to as "Corizon."

29) The Defendant, Corizon is a health care company that provides health care services to jails and prisons across the United States, and specifically at all times relevant to this action was providing health care services to the Guilford County Jail pursuant to a written contract with Guilford County ("the Contract").

30) At all times relevant hereto, Sheriff B.J. Barnes was responsible for the administration, operation and supervision of the Guilford County jail system, and for the promulgation and enforcement of the rules, regulations, policies,

-6-

customs and practices relevant thereto and at all times pertinent hereto was acting in that capacity and under the color of state law.

31) The Defendant, Guilford County, is a county within the State of North Carolina created by the North Carolina Constitution and the General Statutes of North Carolina.

32) At all times relevant hereto, Corizon was the agent of the County of Guilford pursuant to a written contract for health care services for the county jail.

33) The Defendant, The Local Government Excess Liability Fund, Inc. ("Liability Defendant") is a corporation existing under the laws of the State of North Carolina that provides a surety bond for the Sheriff of Guilford County, which constitutes a waiver of governmental immunity.

34) Upon information and belief the Defendants Sheriff B.J. Barnes and Guilford County ("Guilford Defendants") may be insureds under a liability insurance policy or participation in a Risk Pool as authorized by the North Carolina General Statutes. In such case, the Guilford Defendants waived governmental immunity pursuant to N.C. Gen. Stat. § 153A-435(b); and/or governmental immunity has been waived by violating statutory duties found in N.C. Gen. Stat. §§221 and 225, which require the County to implement and supervise medical conditions and emergencies in its jail.

-7-

## CONDITIONS PRECEDENT

35) Plaintiffs have complied with all conditions precedent in this case and exhausted all applicable administrative remedies, or they have been waived.

36) To the extent that a Rule 9J certification is required, if any, for any Count alleged herein, the nursing care provided to Bryan Simmons by the Defendants has been reviewed by an expert qualified to testify under the North Carolina Rules of Evidence. She has reviewed the medical care and all medical records pertaining to the care provided to the plaintiff and, after reasonable inquiry, is willing to testify that the care did not comply with the applicable standard of care.

37) This action is brought within all applicable statutes of limitation and/or repose.

## GENERAL FACTUAL ALLEGATIONS

38) The Plaintiff, Bryan Simmons, was given a 90 day active sentence for a parole violation. Said sentence was to begin on September 4, 2012 and end on December 3, 2012.

39) For approximately the last two months of his 90 day sentence, Simmons was incarcerated in the Guilford County Jail, located in Greensboro, North Carolina.

40) During his incarceration, Simmons was a model prisoner, complying with all requests and commands of the detention officers who were employed by the Guilford County Sheriff's Department and thus Guilford County.

-8-

41)   At the time Simmons was admitted into the jail, he had no significant medical
      issues.

42)   In late November 2012, Simmons began to complain of severe stomach pain,
      prolonged constipation, and he began vomiting blood.

43)   Simmons made the jailers and the medical staff of Corizon aware of his medical
      complaints and his bloody vomit was readily apparent to the Defendants.

44)   Corizon's contract with Guilford County required it to comply with the
      National Commission on Correctional Health Care (NCCHC), which provided
      the minimum standards of healthcare to inmates.

45)   Corizon was also contractually obligated to abide by a written directive from
      the Director of Health Services for Guilford County.

46)   Corizon's contractual obligation was to provide 24 hour emergency care, 7 days
      a week. This contract with Corizon had been renewed approximately 10 days
      prior to the events described herein.

47)   Section J-E-12 of the NCCHC required the healthcare provider to timely review
      the findings of lab work with the inmate and to modify treatment of the patient
      based upon the results of the lab work.  Then the physician is responsible for
      implementing the change.

48)   On November 22, 2012, Corizon nurses took the blood of Simmons, sent it to a
      laboratory and administered certain laxatives.

-9-

49) The results of the work were received by the jail on or before November 24, 2014.

50) There were two very important test results from this lab work (BUN and Creatinine Serum). These tests measure the level of waste product in the bloodstream. A high reading in these two tests is recognized as being an indication of intestinal bleeding and renal failure. A normal BUN score is 5-20. Simmons registered a 38. A normal Creatinine level is .57 to 1.27 – Bryan's was 5.01.

51) The blood work of Simmons was not reviewed by Corizon's jail physician until December 4th, 2012, approximately two days after Simmons went into cardiac arrest and suffered a hypoxic brain injury on December 2, 2012.

52) On November 22, 2012, Thanksgiving Day, Simmons called his parents from a telephone at the jail. This telephone call was recorded by the Sheriff's Department. In the telephone conversation, Simmons told his parents that he has been unable to "go to the bathroom" for several days and had been "throwing up blood."

53) His parents expressed concern that he might have "locked bowels", a potentially fatal condition.

54) On November 24th, 2012, Simmons was found on the floor of his cell, apparently where he had fallen and was unconscious. There were signs of

-10-

blood on his clothing and floor.

55) He was not examined by a physician and his request to be seen at a hospital was denied by the Corizon staff.

56) Medical records document the vomiting of blood, decreased urine output and no bowel movements for two weeks.

57) Without a cessation of his symptoms, on November 30th, 2012 Simmons' medical records indicate that he complained of sharp abdominal pain and shortness of breath. He was apparently given some type of pain medication, but was not examined by a physician.

58) On Saturday, December 1, 2012, another inmate, Charles "CV" Smith called Bryan's parents, Glenda and Calvin Simmons, on behalf of Bryan. The telephone call was recorded by the Sheriff's Department. In the call, CV explained that Bryan was too sick to come to the phone; that Bryan had collapsed on the floor and had urinated on himself during the night. Simmons had asked CV to beg his parents to come to the jail.

59) Simmons' parents immediately went to the jail. Glenda and Calvin arrived at the jail at approximately 1:30 PM, soon after CV's call. Their request to see their only son was denied. They spoke with a detention officer, who said that they could not see Bryan, but the officer had "EMT training" and that he would check on Bryan.

-11-

60) The officer returned in a few moments and said that he had walked Bryan around, he had checked Bryan's pupils and that he had checked Bryan's head for injuries from his fall. He reassured the parents that Bryan was okay and that he had ordered new clothes and linen for him.

61) Glenda Simmons begged the jailer to take Bryan to the hospital and if nothing was wrong they could bring him back. She explained that Bryan was going to be released in less than two days and that there was no other explanation for him wanting to go to the hospital, other than his serious medical condition. The jail made no documentation of this visit.

62) Simmons was to be released at 9 AM on Monday, December 3rd, 2012.

63) Around 4:55 PM on December 1, the jailers and nurse reported that Bryan had a bloody rag in this mouth and wanted to kill himself due to the pain he was experiencing. He was transferred to a "suicide watch" cell which had a window in the door and a glass sidelight.

64) At 10:35 that night, Corizon nurses observed Simmons with bloody vomit on his face, but told Simmons that hospitalization is not required.

65) A video camera was set up outside of his door to videotape Simmons. There was also a video camera located in the back of the cell pointed towards the cell door.

66) Most of the next several hours in the cell were recorded, but there is a

-12-

significant amount of time in which there is no recording.

67) Simmons was placed in the cell in a wheelchair because he was unable to stand or walk without assistance.

68) Under its contract with the County, if an inmate is transferred to a hospital from the jail for medical treatment, the cost of the hospital care is Corizon's expense.

69) At 12:12 AM on December 2nd, a female detention officer checked on Bryan. He explained that he was in great pain ("on a scale to 1-10 – I'm a 20") and that he had been throwing up blood for days. He said the pain was in his stomach and groin. At this point, the video shows that his stomach is greatly distended. He told the officer that "there is a blockage in my stomach or something." He also told the staff that he is "bleeding on the inside" and that he "can feel it churning" in his stomach.

70) Approximately 10 minutes later on the video one can see and hear Simmons say "Help, Help" and he proceeded to spell out the word "Help" in the air with his finger in front of the window and video camera followed by drawing "9-1-1".

71) A short time later, another guard (male), was asked by Simmons for a cup of water. The jailer replied that he will tell the nurse about his request. When the guard returned, Simmons asked the same officer for a drink of water, but Simmons is told that he can get some water out of the sink that was behind a short concrete wall located behind him.

-13-

72) Simmons was in a wheelchair and said he could not walk. The guard indicated that he believed he could walk. Over the next several minutes, Simmons was seen trying to maneuver his chair to the sink. However, his wheelchair was too wide to fit between a steel bench and the corner of the concrete wall.

73) Eventually, Simmons was able to stand using the wall as a support and briefly got to the sink for a sip of water before returning to his wheelchair.

74) Throughout the hours of the night and early morning, Simmons was seen and was recorded vomiting blood many times and for long periods of time. Blood was observed coming from his mouth and falling on his chest, the floor and projecting onto the glass window on the door.

75) Simmons called a guard and said "I'm foaming at the mouth." The foaming is visible to the guard and recorded in the video.

76) A different male guard then checked on Simmons sometime later. Simmons complained that he was experiencing great pain in his stomach and the guard said he would call a nurse. Despite the fact that this is well after midnight, Simmons had not slept due to the discomfort.

77) Subsequently, in the video you can hear an intercom conversation in the cell. Simmons twice said "I've just thrown up blood again", to which the officer said, "OK", "Standby". A few minutes later a guard arrives, sees the blood and said, "I will get the nurse to take a look at you."

-14-

78) At 1:59 AM a male nurse, wearing a Corizon badge and with an Hispanic accent, checked on Simmons. He was recorded as saying, "We've put you on the doctor's list already - when he comes in, he will see you first." But Simmons explained that he is due to be released the next day before the doctor arrives. Bryan told the nurse, "I'm bleeding on the inside . . . I can feel it churning." The deputies proceeded to clean the cell of the vomited blood.

79) The slightest touching of Bryan's stomach resulted in pain. This hypersensitivity combined with his distended stomach and blood vomit, are direct symptoms of internal bleeding.

80) The nurse repeated that they had "told the doctor about it" but that the nurse cannot send him to the hospital, "only the doctor can."

81) Bryan constantly tells the male nurse that he is "bleeding on the inside" and that he can "feel it churning." The nurse tells Simmons that the doctor will not see him until 9:00 AM the next day but Simmons constantly tries to explain that he is going to be released before then. The nurse responds by saying "the doctor comes on Mondays and that's the way it is [sic] to be."

82) Bryan then told the nurse, "I've been throwing up blood for days". The nurse asked, "How many days" and Bryan responded, "About four." To which the nurse can be heard to say, "Survive that thing now" or "Survive the day now" followed by "You'll be alright."

-15-

83) At one point Simmons complained to a detention officer through the intercom in his cell that he was constantly vomiting blood and was in great pain, and through the intercom the detention officer said, "You need to stop making yourself throw up".

84) While the jailers were cleaning the blood from the window and floor, Bryan refused to move his wheelchair from the doorway until he could get some medical help. He was forced back into the cell by jailers pushing on his stomach which caused Bryan to scream in pain. Both the nurse and the guard can be heard saying, "You'll be alright."

85) The same male Corizon nurse then pointed at the blood on the floor and explained to the others present (as recorded on the video) that "this is not fresh blood." He says that is "old blood" . . . "probably from the gastric." He then said "ulcer probably."

86) Despite this suspected and potentially fatal diagnosis, no other medical care is provided and no consultation with a physician occurred or was even suggested.

87) Later that day at approximately 1:00 PM, Simmons, who had not slept, was removed from the cell and escorted to an elevator in preparation for his release. A video camera in the elevator showed Simmons collapsing in the elevator.

88) A guard on the elevator pulled Simmons to his feet by his handcuffs.

89) On the way to a cell on the medical ward, Bryan collapsed again and again was

-16-

pulled to his feet by the jailer.

90)     Simmons was finally placed in a cell.

91)     Approximately eight minutes later, Simmons went into cardiac arrest caused by excessive internal bleeding from a perforated ulcer.

92)     An emergency 911 call was made.  The Fire Department arrived first, followed by Guilford County EMS (Emergency Medical Services).

93)     According to the EMS notes, the responding medics asked for any complaints from Simmons before he collapsed.  Recorded in their notes they were told, "According to staff, patient was reported to have vomited once last night however has not had and reported any complaint today."  There is no mention of the previous days or the preceding night wherein Simmons had complained of pain, distention, his concern about internal bleeding or his constant vomiting of blood for at least four days despite the actual knowledge of the custodians, and more particularly, the nursing staff.

94)     One requirement under the arrangement with the County's Health Director is that when there is a "code" that nurses must respond with a "code kit" and oxygen. The video showing Bryan being removed from his cell shows no medical equipment being removed from the cell and no oxygen being applied to Simmons.

95)     Simmons was wheeled from his cell, unconscious, to a medical treatment room.

-17-

In the video recording there is no administration of any medical treatment and there is no sense of urgency of the medical staff in taking him to the examination room.

96) Upon information and belief, the medical equipment needed for a code was locked in a room and the staff could not immediately locate a key to access the equipment.

97) CPR was eventually begun at the jail, and Simmons was transported to Moses Cone hospital with a perforated and bleeding ulcer that had induced the cardiac arrest. Due to the lack of oxygen to his brain, Simmons suffered a catastrophic hypoxic brain injury.

98) Upon information and belief, 34 minutes elapsed from the time of Simmons' collapse and the administration of oxygen by medical personnel.

99) Due to the lack of oxygen after his collapse, Simmons is profoundly disabled and is in a permanent vegetative state. He is a complete quadriplegic. His hands and feet have become horrifically contorted over time. He is only able to breathe through a tracheotomy. He is unable to be fed except intravenously. At times he suffers bedsores that are so deep that exposed bone can be seen in the wound. He is unable to speak. He intermittently must be re-hospitalized due to bed sores and infections.

100) Under the terms of its contract with Guilford County, Corizon is paid 6.9

-18-

million dollars for 24 months of inmate care.

101) Corizon contractually agreed to provide 24 hour emergency medical care, 7 days a week to all inmates.

102) Corizon agreed to meet or exceed NCCHC standards.

103) Corizon agreed to meet or exceed the written directives of the Guilford County Health Services Director.

104) Paragraph G of Exhibit A to Corizon's contract with Guilford County requires a physician to perform daily triage of complaints from inmates. There is no indication that Corizon's jail physician, Dr. Fitzhugh, ever examined Bryan from at least November 22nd through his cardiac arrest on December 2nd.

105) Upon information and belief, Dr. Fitzhugh, the Corizon physician for the jail, did not review the November 22nd blood work until December 4, 2012 - 2 days after Bryan was in a vegetative state.

106) Paragraph V of the Corizon contract is entitled "Medical Care." It requires Corizon to identify, coordinate and pay for all emergency care given to inmates. By delaying treatment to Simmons, Corizon could avoid the charges associated with hospitalization, knowing that Simmons' release from the jail was imminent.

107) The NCCHC requires that inmates have access to care. The term "access to care" is defined in the regulations as receiving medical care in a timely fashion.

-19-

Corizon did not provide medical care to Simmons for his ulcer, despite having associated his symptoms with that of a bleeding ulcer several hours before his cardiac arrest.

108) Section J-D-05 of the NCCHC says that inmates are to have access to necessary hospitalization with waiting times not to generally exceed the average waiting times in community practice. Simmons was denied hospitalization for at least a week prior to his collapse.

109) The requirement to provide emergency services is mandated in Section J-E-08 which requires a jail to provide 24-hour *emergency* services. (original emphasis).

110) Emergency care is further defined as an acute illness which cannot be deferred until the next doctor's visit. The Corizon nurse told Bryan that only the doctor could send him to the hospital and that doctor was not coming until after Bryan was released, and said, "that's the way it is to be."

### COUNT I
**(42 U.S.C. 1983 Claim against Defendant Sheriff, B.J. Barnes in his Official Capacity, and Guilford County)**

111) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

112) Count I is brought against the Defendant Sheriff B.J. Barnes in his official capacity, and Guilford County pursuant to 42 U.S.C. 1983 for deliberate

-20-

indifference to the critical medical needs of Simmons, as an individual with a bleeding ulcer and with symptoms of prolonged constipation, frequent and repeated vomiting of blood, distended stomach, severe pain, etc., that required testing and immediate emergency treatment to prevent substantial health deterioration including cardiac arrest, hypoxic brain injury and a persistent vegetative state.

113) At all times relevant hereto, the Guilford defendants had a non-delegable statutory duty pursuant to N.C. Gen. Stat. 153A-221 to establish and maintain medical care for prisoners. More specifically, the Guilford County defendants are required by statute to develop (1) a plan to protect the welfare of prisoners; and (2) to "provide medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare." N.C. Gen. Stat. §153A-225.

114) The Guilford County Sheriff and/or his employees or agents, knew at least by November 22, 2012 that Simmons was critically ill and if left untreated he could suffer serious permanent medical disability or even death.

115) By at least November 22, 2012, the Guilford County Sheriff's Department and its employees or agents knew that Simmons was suffering great medical distress, and had collapsed on several occasions and had lost his ability to walk or stand due to his medical condition.

116) Despite the Sheriff's knowledge of Simmons' serious medical condition and needs, Defendant Sheriff's Department was deliberately indifferent to those serious medical needs in failing to provide the necessary care and treatment of Simmons.

117) The Sheriff Deputies who were engaged to oversee Simmons during his incarceration were either improperly trained to ascertain and handle foreseeable medical emergencies, such as Simmons', or were indifferent to his plight, thereby posing a pervasive and unreasonable risk of catastrophic injury to Simmons.

118) Pursuant to N.C. Gen. Stat. §153A-224, there is an affirmative duty on custodial personnel, such as the Sheriff when it comes to emergency medical care which requires the Sheriff to provide and pay for a physician to treat the ailing inmate, but the jailers refused emergency treatment for Simmons despite (1) his obvious deteriorating condition; (2) the pleas of Simmons to go to the hospital and (3) the pleas of his family to take him to the hospital.

119) The Sheriff either had actual or constructive knowledge of Simmons' condition.

120) Furthermore, the gross failure of the Sheriff's deputies to properly care for Simmons over a prolonged period of time represents supervisory indifference and/or implied authorization of said deputies' care and management of Simmons' situation.

-22-

121) The actions and inactions of the Sheriff's deputies were in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known.

122) The Guilford County Sheriff's Department and/or its employees or agents knew or should have known that taking no action and/or insufficient action could result in the rapid and permanent deterioration of Simmons' health and even his death.

123) The Sheriff's Department knew that less than two years earlier, a 21 year old inmate had died in their custody due to lack of medical attention. In particular the inmate was strapped to a restraining chair for 24-36 hours from which he developed a blood clot and died, when all protocol indicated the use of the chair should not exceed two hours. The inmate's health and restraint was monitored by Corizon.

124) In regards to the inmate's death above, Sheriff Barnes, in a televised interview, denied that the Sheriff's Department "had done anything wrong" and that the attorneys are the ones that decided to pay it.

125) Additionally, the Sheriff knew or should have known prior to Simmons' treatment, that the health care provided by Corizon had been severely publicly criticized in many locations across the country, including the following:

-23-

a. In 2011, the Associated Press reported that Corizon was fined $382,000 by the state of Idaho "for failing to meet some of the basic healthcare requirements outlined by the state."

b. A 2011 Report by the Maine State Legislature Office of Program Evaluation and Government Accountability revealed serious deficiencies in the care provided to Maine prisoners by Correctional Medical Services, Inc, (later merged into Corizon in 2011).

c. A 2007 report in the New York Times that Prison Health Services (who merged with Corizon in 2011) stated, "A yearlong examination of Prison Health by the New York Times reveals repeated instances of medical care that has been flawed and sometimes lethal." *As Health Care in Jails Goes Private, 10 Days Can be a Death Sentence*, February 27, 2005.

d. It has been reported in the press, (i.e. Miami Herald and others) that Corizon has been sued over 660 times. *Florida Prison Healthcare providers sued hundreds of times."* Miami Herald, October 2, 2013 (while the article was published after Simmons was incarcerated, the lawsuits referenced occurred before Simmons was incarcerated).

e. Corizon lost its healthcare contract from Minnesota for allegedly failing to provide adequate healthcare. (*Corizon loses Minnesota prison healthcare contact*, Modern Healthcare, October 13, 2013).

126) As a direct and proximate result of the Sheriff's Department institutional outright denial of medical treatment and/or deliberate indifference towards Simmons' serious medical needs, Simmons suffered great physical injury, pain, discomfort and mental anguish in violation of Simmons' Eighth and Fourteenth Amendment rights.

127) As a result, Simmons suffered damages in an amount to be determined at trial for his bodily injury and resulting pain and suffering, disability, disfigurement,

-24-

mental anguish, loss of capacity for the enjoyment of life, expenses for his care and treatment in an effort to alleviate and cure his injuries, and will continue to incur additional expenses in the future, loss of earnings, loss of ability to earn money. The losses are permanent and Simmons will suffer losses in the future. Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest and further relief as the Court deems appropriate.

## COUNT II
### (42 U.S.C. 1983 Claim against Defendant Corizon)

128) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

129) Count II is brought against the Defendant Corizon pursuant to 42 U.S.C. 1983 for deliberate indifference to the critical medical needs of Simmons, as an individual with a bleeding ulcer and with symptoms of constipation, frequent vomiting of blood, distended stomach, severe pain, etc., that required testing and immediate emergency treatment to prevent substantial health deterioration including cardiac arrest, hypoxic brain injury and a persistent vegetative state.

130) Corizon and/or its employees or agents, knew at least by mid-November 2012 that Simmons was critically ill and if left untreated he could suffer serious permanent medical disability or even death.

131) By at least Thanksgiving 2012, Corizon and its employees or agents knew that

-25-

Simmons was suffering great medical distress, and had collapsed on several occasions and had lost his ability to walk or stand due to his medical condition.

132) Despite Corizon's knowledge of Simmons' serious medical condition and needs, Defendant Corizon was deliberately indifferent to those serious medical needs in failing to provide the necessary care and treatment of Simmons.

133) The actions and inactions of Corizon employees and/or agents were in the face of an unjustifiably high risk of harm that was either known or so obvious that it should have been known.

134) Corizon and/or its employees or agents knew or should have known that taking no action and/or insufficient action could result in the rapid and permanent deterioration of Simmons' health and even his death.

135) At all times relevant to this Complaint, it was Corizon's widespread custom, policy and/or practice and/or procedure to outright deny medical treatment or be deliberately indifferent to the serious medical needs of Plaintiff and other prisoners/detainees incarcerated with the Guilford County Jail system who had serious and expensive medical problems.

136) As a direct and proximate result of Corizon's institutional outright denial of medical treatment and/or deliberate indifference towards Simmons' serious medical needs, Simmons suffered great physical injury, pain, discomfort and mental anguish in violation of Simmons' Eighth and Fourteenth Amendment

-26-

rights.

137) As a result, Simmons suffered damages in an amount to be determined at trial for his bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expenses for his care and treatment in an effort to alleviate and cure his injuries, and will continue to incur additional expenses in the future, loss of earnings, loss of ability to earn money. The losses are permanent and Simmons will suffer losses in the future. Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest and further relief as the Court deems appropriate.

## COUNT III
### (Negligence against Defendants)

138) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

139) The Defendants owed a duty to the Plaintiff Simmons, to provide him with needed health care while he was incarcerated in the Guilford County jail. The Defendants negligently breached that duty in one or more of the following ways:

140) As to Guilford County:

   a. It failed to monitor the contractual obligations it had imposed on Corizon.

   b. After entering into a contract, it failed to review Corizon's policies and procedures that it put into practice.

-27-

c. Failed to implement procedures for medical supervision of prisoners and emergency medical care in violation of N.C. Gen. Stat. §§153A-221 and 225.

141) As to Guilford County Sheriff:

a) Failed to provide emergency care;

b) Failed to contact its physician in charge and relay Simmons' symptoms;

c) Failed to transport Simmons to a hospital;

d) Misrepresented Simmons' condition to his parents.

e) Denied Simmons access to water.

f) Rather than take Simmons to the hospital, they told him to "stop making yourself throwup."

g) Failed to monitor Corizon's healthcare services despite the death of an inmate due to lack of medical care less than two years earlier.

h) Failed to review Corizon's services despite national criticism.

142) As to Corizon Defendant, said defendant impermissibly deviated from the applicable standard of medical care in one or more of the following ways:

a) They did not ensure that Mr. Simmons had access to appropriate and timely health care to meet his serious health needs on December 1, 2012.

b) The nursing assessments documented numerous times at the Guilford County Jail did not give Mr. Simmons access to necessary hospitalization despite many abnormal findings and much distress and suffering and his begging to be sent to the hospital by this inmate.

c) Simmons had labs drawn on November 22nd that were clearly abnormal yet there was no documentation of reporting these or follow up.

-28-

d) On December 1, when Simmons was in severe pain, his vital signs were abnormal and much lower than his baseline; he was unable to walk and was given antacid for his symptoms. The nursing staff failed to recognize the significance of all of the above findings and report it in order to get Mr. Simmons the needed medical attention and hospitalization.

e) At least by December 1, he should have received medical care when no bowel sounds were present in Mr. Simmons abdomen except faint ones in the right lower quadrant and his blood pressure was low and his heart rate was 123.

f) This inmate had clear signs of shock that were not recognized and acted upon.

g) On December 2nd at 1325 the nurse documented that Mr. Simmons vomited "black emesis with limited to no movement and shallow respirations. Officers were instructed to move him to Medical." At that time he was pulseless and unresponsive. He should have had emergency measures instituted immediately.

h) Failed to provide emergency care;

i) Failed to timely review blood work;

j) Failed to contact its physician in charge and relay Simmons' symptoms;

k) Failed to transport Simmons to a hospital;

l) Misrepresented Simmons' medical conditions to EMS personnel;

m) Failed to provide appropriate medical response to symptoms of a bleeding ulcer;

n) Failed to provide appropriate medical response to Simmons' cardiac arrest;

o) Failed to adhere to paragraph G of Exhibit A to Corizon's contract with Guilford County which required a physician to perform daily triage of complaints from inmates.

-29-

143)   As a direct and proximate result of the negligence of the Defendants, the
Plaintiff, Simmons, suffered damages in an amount to be determined at trial for
his bodily injury and resulting pain and suffering, disability, disfigurement,
mental anguish, loss of capacity for the enjoyment of life, expenses for his care
and treatment in an effort to alleviate and cure his injuries, and will continue to
incur additional expenses in the future, loss of earnings, loss of ability to earn
money.  The losses are permanent and Simmons will suffer losses in the future.
Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest
and further relief as the Court deems appropriate.

## COUNT IV
### (Negligence Per Se – as to Corizon Defendant)

144)   Plaintiffs repeat and reallege each and every allegation set forth above with the
same force and effect as if set forth fully herein.

145)   Corizon's contract with Guilford County required it to comply with the
National Commission on Correctional Health Care (NCCHC) which provided
the minimum standards of healthcare to inmates.

146)   The regulations contained in the NCCHC were enacted for the safety and
welfare of inmates such as Bryan Simmons, and were specifically enacted for
the purposes of ensuring that inmates received adequate medical care during
their incarceration.

-30-

147) To be accredited by the NCCHC, medical providers must comply with its standards.

148) At all times relevant to this action, Corizon was accredited by the NCCHC.

149) As part of its advertisement for its services to jails and prisons, Corizon represents to the public that "Corizon Health's expertise in facilities accreditation can help you meet and exceed the standards of local, state and national agencies. We have extensive experience working with the NCCHC."

150) A violation of the minimum standards for health care in prisons established by the NCCHC constitutes negligence *per se*.

151) Corizon violated the NCCHC standards in one or more of the following ways:

   a) Section J-E-12 of the NCCHC required the healthcare provider to timely review the findings of lab work with the inmate and to modify treatment of the patient based upon the results of the lab work. Then the physician is responsible for implementing the change and Simmons lab work was not reviewed by a physician until approximately 9 days after they were received and two days after his cardiac arrest.

   b) The NCCHC requires that inmates have access to care. The term "access to care" is defined in the regulations as receiving medical care in a timely fashion. Corizon did not provide medical care to Simmons for his ulcer, despite having associated his symptoms with that of a bleeding ulcer several hours before his cardiac arrest.

   c) Section J-D-05 of the NCCHC says that inmates are to have access to necessary hospitalization with waiting times not to generally exceed the average waiting times in community practice. Simmons was denied hospitalization for at least a week prior to his collapse.

   d) The requirement to provide emergency services is mandated in Section J-E-

-31-

08 which requires a jail to provide 24-hour *emergency* services. (original emphasis). Emergency care is further defined as an acute illness which cannot be deferred until the next doctor's visit. The Corizon nurse told Bryan that only the doctor could send him to the hospital and that doctor was not coming until after Bryan was released, and said, "that's the way it is to be." Thus no emergency care was provided.

152) As a direct and proximate result of the negligence of the Defendants, the Plaintiff, Simmons, suffered damages in an amount to be determined at trial for his bodily injury and resulting pain and suffering, disability, disfigurement, mental anguish, loss of capacity for the enjoyment of life, expenses for his care and treatment in an effort to alleviate and cure his injuries, and will continue to incur additional expenses in the future, loss of earnings, loss of ability to earn money. The losses are permanent and Simmons will suffer losses in the future. Simmons also seeks reasonable attorneys' fees and costs, pre-judgment interest and further relief as the Court deems appropriate.

## COUNT V
### (Tiffany Simmons' loss of consortium claim against Defendants)

153) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

154) Tiffany and Bryan Simmons were married in March 2012.

155) They had a loving relationship and supported each other emotionally, financially and in other ways that a husband and wife support each other.

-32-

156) In the marital relationship there is a mutual right of a husband and wife to the society, companionship, comfort and affection of one another.

157) Through the reckless indifference and/or negligent conduct of one or more of the Defendants as set forth herein, Bryan Simmons was rendered unable to provide society, companionship, comfort and affection to his wife in that he is in a permanent vegetative state.

158) As a result of the medical, physical and intellectual condition of her husband, Tiffany Simmons has lost the society, companionship, comfort and affection of her husband. Because of this loss of consortium, Tiffany Simmons is entitled to recover money damages in an amount to be determined by a jury.

## COUNT VI
### (Punitive damages against Defendants Corizon)

159) Plaintiffs repeat and reallege each and every allegation set forth above with the same force and effect as if set forth fully herein.

160) The callous acts of Corizon as described herein constitute malice or willful or wanton conduct and a deliberate and/or reckless indifference to Mr. Simmons' rights.

161) The officers, directors, or managers of Corizon participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages in that similar acts of reckless indifference have incurred not only in other prisons

-33-

and jails across the country, but actually in the Guilford County jail.

162) As a result of the acts described herein, Bryan Simmons is entitled to a recovery of punitive damages to be determined by a jury.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray for judgment against the Defendants as follows:

1) That the Plaintiffs have and recover compensatory damages from the Defendants in an amount to be determined at trial.

2) That the Plaintiffs be awarded punitive and/or exemplary damages for malicious, wanton, willful, reckless acts of the Defendant, Corizon, which demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendant and deter future similar conduct.

3) That the Defendants be taxed with the costs of this action, including reasonable attorney fees as allowed by law, expenses, prejudgment interest, etc.

4) That all issues so triable, be tried to a jury.

5) For any other relief this Court deems just and proper under the circumstances. This the 5th day of November, 2014.

-34-

/s/ Fred W. DeVore, III
Fred W. DeVore, III – Bar #10308
F. William DeVore, IV – Bar #39633
Derek P. Adler – Bar #39488
*Attorneys for Plaintiffs*
DeVORE, ACTON & STAFFORD, PA
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 *facsimile*
*fdevore@devact.com*

## CERTIFICATE OF SERVICE

This is to certify that on this day, a copy of the foregoing document entitled **FIRST AMENDED COMPLAINT** was filed electronically with the Clerk of Court using the CM/ECF system, which will send notice of such filing to the following registered CM/ECF users:

**FRAZIER LAW**
JAMES DEMAREST SECOR, III
jsecor@frazierlawnc.com
sserrin@frazierlawnc.com

WILLIAM L. HILL
whill@frazierlawnc.com
fhf@frazierlawnc.com
jweeks@frazierlawnc.com

**McQUIRE WOODS**
JUSTIN D. HOWARD
jhoward@mcguirewoods.com
jmurphy@mcguirewoods.com
tlessing@mcguirewoods.com

MARK E. ANDERSON
manderson@mcguirewoods.com
jkurlanzik@mcguirewoods.com
jwinebrenner@mcguirewoods.com

This the 5th day of November, 2014.

/s/ Fred W. DeVore, III
Fred W. DeVore, III – *Attorney for Plaintiffs*
DeVORE, ACTON & STAFFORD, PA
438 Queens Road
Charlotte, NC 28207
(704) 377-5242
(704) 332-2825 *facsimile*

-35-